## JAMES S. RHODES et al. *v.* ELIHU HOOPER et al.

Where property is held in common by the mother and her six children, the interest of all of the children cannot be sold on an execution against the mother and two only of the children.

RHODES
*v.*
HOOPER.

The possessor of slaves who was *ab initio* in bad faith is bound to account for the hire of the slaves from the time his possession began. C. C. 3415, 495.

If a party instigates the issuing of an execution for the purpose of seizing property which he knows does not belong to the debtor, and at sheriff's sale becomes the purchaser of the property, he will be regarded as a possessor in bad faith from the date of his purchase.

In the estimation of the value of the services of slaves which have been in the possession of a party even in bad faith, the expense of clothing, taxes, medical attendance, and probable loss of time should be considered.

A party who has acted in bad faith will not be allowed to set up the plea of compensation founded upon another transaction.

A party who urges the defence, that the suit is based upon the purchase of a litigious right, must tender the price given by the plaintiff, and cease all contest as to the validity of the original claim.

APPEAL from the District Court of East Baton Rouge, *Burk*, J. *A. M. Dunn*, for plaintiffs. *G. S. Lacey* and *J. M. Elam*, for defendants. The judgment of the court was pronounced by

ROST, J. *John Rhodes* died in 1830, leaving *Sarah Rhodes*, his widow in community, and six minor children, *James, Armistead, John, Benjamin, Alexander* and *Theodore B. Rhodes*. Two of these children have since died; namely, *Alexander*, in 1843, and *Armistead* subsequent to the institution of this suit.

It appears that the widow and minors were the owners in common of several slaves, some of whom were purchased by the widow after the death of her husband, and that upon an execution issued in the case of *Skolfield* v. *T. B. Rhodes*, *Sarah Rhodes* and *E. Hooper* in July, 1845, these slaves were seized, and *Hooper* became the purchaser at sheriff's sale at the price of $4175. This action is brought by some of the children of *Rhodes* against *Hooper*, for the purpose of recovering the negroes, a reasonable sum for their hire since they came into the possession of *Hooper*, and their value if not restored. *Sarah* and *Theodore B. Rhodes* were not made parties by the plaintiffs, nor has the defendant attempted to bring them into the cause.

*Hooper* in his answer set up title as a purchaser in good faith under the sheriff's sale, and also pleaded that in June, 1845, the slaves were mortgaged to the *Union Bank* by *Mrs. Rhodes*, as widow and tutrix, for the security of a loan; that he paid the bank, and being subrogated to its rights, is entitled to set off that amount against any claim the plaintiffs may have against him.

It is obvious that the sheriff's sale upon execution against two only of the owners, *Sarah* and *Theodore B. Rhodes*, did not divest the title of the other co-proprietors,—the plaintiffs in this cause. It operated only upon the interest of *Sarah* and *Theodore*,—the debtors and defendants in execution.

The plaintiffs, then, are entitled to be recognized as owners of their interest or undivided shares of these slaves, and to be restored to possession, or, in default of such restoration, to recover the value of their slaves. They are also entitled to compensation for the lost services of the slaves, of which *Hooper* and his heirs have had the benefit.

The first question which presents itself for our consideration is, from what date this hire or compensation is to be allowed,—from the date when *Hooper* took possession under the sheriff's sale, or from the inception of this suit? This point depends upon the question whether, *quoad* the interest of the plaintiffs in the property so bought at sheriff's sale, *Hooper* was a purchaser in good faith. For if he bought in good faith, that is to say, if he had just reason to believe that it belonged entirely to *Sarah* and *Theodore Rhodes*, the defendants in execution, he is bound, under articles 3414 and 3416, to account to the true owners only from the time of the claim for restitution. But if he was *ab initio*

a possessor in bad faith, that is to say, if he knew, when he bought, the defectiveness of his title, he is bound to account from the date of his purchase. C. C. 3415, 492. A witness testified that *Hooper* knew, at the date of the sheriff's sale, that the property was owned in part by the plaintiffs, and that he and the sheriff were warned at the auction of their rights. This testimony is not contradicted by any other witness, and on the contrary, is corroborated by the fact that *Hooper* made an agreement with *Skolfield*, by which he was induced to have the slaves seized, and gave the sheriff a bond of indemnity, to induce him to levy upon and sell them.

In the estimation made by the court of the amount to be paid for hire, we are of opinion that a sufficient allowance was not made in favor of the defendant for the expense of clothing the slaves, taxes, medical attendance and loss of time; which are just elements in calculating the compensation to be paid even by a possessor in bad faith. The true owner, if his possession had not been disturbed, would have incurred these expenses and drawbacks, which are incident to this class of property.

There is a controversy with regard to one of the slaves sold at the sheriff's sale, named *Hager*. This slave was bought by *Mrs. Rhodes* in her own name. She was at that time tutrix of her children; the community had not been settled, and was under her administration. A witness, the son of *Mrs. Rhodes*, testifies that she paid for this slave, to use his expression, with the proceeds of the crops in community between witness, his mother and her children. The rule which, under certain circumstances, is recognized in the equity jurisprudence of England and our sister States, is perhaps one which would be recognized here, to wit, that where a person who is acting in a fiduciary capacity uses the trust fund to make a purchase for himself, the beneficiary may, as between himself and the trustee, elect to take the property. But aside from other difficulties which would, perhaps, interpose themselves to the application of the principle to the present case, it is not clear from the evidence that the latent equity now invoked was known to *Hooper*.

After a careful consideration of the evidence, we have found it necessary to reduce the estimate of the value of some of the slaves made by the district judge. As the defendant was instrumental in obtaining the seizure and sale of the entire property in disregard of the partial ownership of the plaintiffs, and obtained possession in bad faith *quoad* their interest, we cannot allow him to set up in compensation the *Union Bank* claim against the amount due by him to the plaintiffs. See *Nolan* v. *Shaw, ante* p. 40. *McKee* v. *Amonett, ante* p. 207. His rights, however, under the bond, mortgage and subrogation will be reserved by our decree.

It is conceded in the brief filed by the counsel for the defendants that the interest of *Alexander* and *Armistead Rhodes*, deceased, has passed to their surviving brothers and mother. And as it appears to be the desire of the parties that this court should terminate the litigation as far as possible, we will frame our decree with reference to the inheritance of the shares of the deceased persons by the plaintiffs *T. B. Rhodes* and *Mrs. Rhodes* respectively.

One of the plaintiffs, *James S. Rhodes*, after the suit was commenced, transferred his interest to *Chapman*, who then appeared, filed his deed of assignment, and became a party in the cause. It is said that this was the purchase of a litigious right, and consequently that the defendant is entitled to be released from all claim on account of *James'* interest, by paying to the transferree the price of his purchase. He cites the 2622d article of the Code. But the defen-

RHODES
v.
HOOPER.

dant cannot avail himself of its provisions, because, after being informed of the transfer and its price, he did not tender the money, but continued to contest the claim and protract the litigation. See *Leftwitch* v. *Brown*, 4 Ann. 105.

It is therefore decreed, that the judgment of the district court be reversed. And it is further decreed, that the plaintiffs, to wit, *James S. Rhodes*, *John Baker Rhodes* and *Benjamin F. Rhodes*, recover, as the owners in common, from the succession of *Elihu Hooper* an interest amounting to 437-1280 in the following slaves, to wit, *Peggy*, *Rose*, *Betsey* and her two children, *Phillis* and *Sam*, *Sarah* and her two children, *Mary* and a young child, (name unknown,) *Malinda*, *Milly*, *John*, *Mary*, *Wyatt* and *Caroline*, being the slaves described in the plaintiffs' petition, and any increase born of any of said female slaves since the institution of this suit; and that the possession of said interest be delivered to the said plaintiffs by the defendant, administratrix of said succession and tutrix of the minor children of said *Hooper* within twenty days from the rendition of this decree. And that in default of such delivery, the said administratrix do pay to the said plaintiffs the value of said interest in said slaves, to wit, the sum of $2660 62, with interest from the date of this decree. And it is further decreed, that the said plaintiffs do recover from said succession of *Hooper*, by said administratrix represented, the sum of $1448 68, as a compensation due to said plaintiffs, *James*, *John* and *Benjamin*, for the services of said slaves from the 6th September, 1845, with interest on said sum of $1448 68, from the date of this decree until the same be paid. And it is further decreed, that the rights of said succession of *Hooper*, by reason of the obligation and mortgage executed by said *Sarah Rhodes*, for herself and as tutrix of her minor children, in favor of the *Union Bank*, and the subrogation thereto, whereof copies are on file in this cause, be reserved to the said succession of *Hooper*. And it is further decreed, that the costs of this suit in the court below be paid by the said succession of *Hooper*, and that the costs of the appeal be paid by the plaintiffs.